Lauretta Brown, Appellee, v. Alva Blanchard, Appellant.

. No. 47215.

(Reported in 35 N. W. 2d 858)

February 8, 1949.

E. E. Poston and Rosa Lee Snyder, both of Corydon, and Miller, Davis, Hise & Howland, of Des Moines, for appellant.

Elton A. Johnston, of Corydon, for appellee.

124

BLISS, J.—The charges and countercharges and the findings and decree of the trial court concern matters of grave importance to those involved. The facts are the controlling factor in the case and they and the reasons for our decision should in fairness be set out with adequate fullness.

The parties were married September 25, 1929, at Corydon, Wayne County, Iowa, and have lived in the country southeast of Allerton in said county. They had one child, a daughter, Vivian, born September 4, 1930. Plaintiff's grandfather, William Sears, as a gift to both of them, on July 17, 1933 deeded to them as tenants in common the ninety acres of farm land in controversy. Some discord entered the home in the later years of their married life. The evidence in the default divorce was scant. He testified he "guessed she run around with other men when she went to town and other places * * *" she was "not very good" to him and was "cool to him at times." There was no testimony that he suffered from it. The corroboration of a neighbor woman was much more scant. The grounds were inhuman treatment endangering his life.

In the trial of the case before us, plaintiff testified that about six months before they separated: "He and I had talked. We never lived together like people should have lived together. And I asked him one day, 'Just how much of this place would you have to have if we separated?' And he said, 'Well, I want my share of it.' I said, 'Just so you take your share of it and not mine.'" She testified that they had no writing. "Because we had already agreed orally. I figured that would hold. I thought his word was as good as mine. I was willing to give him half of it. My grandpa gave it to me."

Her letters by their incorrect spelling and grammar indicate that plaintiff was a woman of little book schooling. Sometime in the afternoon of Thursday, June 26, 1945, the plaintiff and Vivian, with $50 drawn from defendant's bank account, took the family car and drove to Seymour, about fifteen miles east of Allerton, where they left the car and took the train to Kansas City, Missouri. The next morning, June 27, defendant consulted Rosa Lee Snyder, the county attorney at Corydon, and

requested her to make arrangements for police investigation and for a radio broadcast. No information resulted from these efforts.

Plaintiff and Vivian soon found a room to sleep in and employment as assistants to nurses and doing general work in the General Hospital at Kansas City. From there, under date of June 28, 1945, Vivian wrote a letter—a quite casual letter:

"Dear Dad, Well I hope this finds every-one and things O.K. I am fine. I got me a job in one of these Hospitals down here. I am not just the clean up girl, but take care of the Patients just as well. I have signed up to work until school starts. Mother has a job in the same place. Mom said, she left her cow and everything else, she thought it would pay back the $50.00 she drew out of the bank, and she is sending those cream tickets to Corydon. You can get them there. Mom said she wanted Grandma to have the washing machine.

"Well I had better get some rest cause it won't be long until I go back to work.

"Love, Vivian

"I am going to stay and work so please don't come after me, but I will come willingly to see you if you want me. Mom said I could come and see all of you folks as far as she was concerned. When I get a vacation off from my job I will come back their and stay if you want me.

"Our hours are from 3 o'clock in the afternoon until 11 at night. The pay is three bucks a piece, that's 6 a day and we'll draw more after a few more weeks. Boy! the Hospital sure is big and its a swell place. I came willingly with her. She said she wanted to leave and I could do as I pleased. So don't blame her cause I went. She said she would mail our ration books back to you so you could get the sugar. But would please like you to send them back.

"Vivian"

Plaintiff also wrote a few lines in Vivian's letter:

"Well Alva its over for us. I was not happy and know you were not either. Maby it was a dirty deal on my part but I couldn't see any other way out. If you want a divorce you

can have one and no red tape for me I don't care because I am froze to my work for a yr. so I'll wont come back home. You can get V.B. picture. I will send the slip.

Good Luck and good by."

This letter indicated that she would not put defendant to unnecessary inconvenience or insist upon all formalities in the procuring of a divorce, but there is nothing in it to indicate that she was surrendering to him her half interest in the farm. She wished Grandma to have her washing machine. Her cow and "everything else" would repay the $50, but it is unreasonable to believe that "everything else" was intended to include forty-five acres of farm land as further payment.

Defendant received this letter on Friday, June 29. The next day, June 30, he again consulted Mrs. Snyder and retained her to bring suit for divorce. That day she prepared the petition, with the usual allegations, and stating as ground for the relief, "such cruel and inhuman treatment as to endanger [his] life." Another paragraph alleged "that plaintiff and defendant during their married life accumulated certain household goods—farm equipment and 90 acres of land," giving its governmental description.

In addition to the prayer for divorce, Mr. Blanchard prayed *"that all the property, both real and personal be decreed to be the absolute property of the plaintiff* and plaintiff be granted the custody, care and control of the minor child ·Vivian Grace Blanchard. (Italics added.)

"Alva Blanchard
By Rosa Lee Snyder (signed)
His Attorney."

The printed record prepared by Rosa Lee Snyder simply states: "Plaintiff verified the above Petition." The court file in the divorce action, No. 16358, Wayne County District Court, was an exhibit in this suit. It is before us on certification. Alva Blanchard signed and swore to the usual verification as to the truth of the allegations before Rosa Lee Snyder, notary public, who attested it by her signature and seal as notary public *"this 30th day of June, A.D., 1945."* (Italics added.) The prepara-

tion of the petition and its verification on the date noted are very significant and illuminating with respect to the conduct and testimony of defendant and his attorney, as hereinafter noted.

At five p. m. that very day, which was Saturday, the last day of June, defendant sent Mrs. Snyder "down to Kansas City to find them and see if Lauretta and Vivian were living in a decent place." Mrs. Snyder, with her daughter Lee Ann and her office helper, Charlene Hosey, each about sixteen years old, left on the "Rocket" train for Kansas City, where they arrived at nine p. m. that evening. Mrs. Snyder testified that the next morning, and after lunch, with the help of the police department, she found Lauretta and Vivian at work at the hospital.

Omitting some details, plaintiff testified on direct examination as noted below—some in substance and some verbatim where quotations are shown: "Rosa Lee Snyder, attorney for Alva Blanchard, came to see her about writing up papers for divorce. Mrs. Snyder said Alva Blanchard wanted a divorce and that he would get custody of the minor child, otherwise he wouldn't give any support." Mrs. Snyder then took from her brief portfolio two blank original notice forms and filled the blanks in each of them by pen and ink, stating that there was then on file in the office of the clerk of the district court of Wayne county the petition of plaintiff, Alva Blanchard, against defendant, Lauretta Blanchard, which prays "a divorce of you on the grounds of cruel and inhuman treatment and asking for the custody of the minor child, Vivian Grace Blanchard." Below the paragraph stating the time for appearance, Mrs. Snyder wrote defendant's name and signed her name as his attorney.

"Mrs. Snyder said this paper stated what he wanted in this divorce action, just the custody of the minor child and a divorce. There was nothing said between Rosa Lee Snyder and myself about any property while she was there or at any time. She and her husband had an agreement about the property."

It is conceded by defendant and testified to by Mrs. Snyder that she then took one of the original notices, which was Exhibit 2 below, and wrote the following on the back of it:

"State of Missouri⎱ss.
County of Jackson⎰

"I, Lauretta Blanchard, hereby enter my written appearance and do hereby consent to immediate jurisdiction of the court in the foregoing divorce action without admitting or denying the charge.

"Subscribed and sworn to before me the undersigned this 30th day of June, A.D., 1945."

The date June 30 was written by Mrs. Snyder to avoid any question of legality which might be raised if the actual date of Sunday, July 1, 1945 appeared as the date of the signing and swearing. They then went in search of a notary public but could not find one.

Plaintiff testified that Mrs. Snyder left both notices with her—Exhibit 2, which had the written appearance on the back, and the other notice, Exhibit 1, which plaintiff was to keep. "Mrs. Snyder told me to have it (Exhibit 2) signed by a notary and mail it to her. I signed it in the presence of a notary and mailed it to her. That after I mailed Exhibit 2 to Mrs. Snyder I never saw it again until I went to see [Judge] T. W. Miles. * * * That what was written on the front of Exhibit 2 in her presence, was as follows: 'A divorce of you on the grounds of cruel and inhuman treatment and asking for custody of the minor child, Vivian Grace Blanchard,' and that that was all that was written on the front of Exhibit 2 and the rest of the writing that was on the front of Exhibit 2 ('and that all property both real and personal be quieted in him') was not there when made out in Kansas City in her presence." Plaintiff further testified: "Mrs. Snyder left plaintiff's Exhibit 2 with me and Vivian and I went down to the notary and had it signed. We had the landlady show us. That was all we had notarized at that time. That was the next day after she (Mrs. Snyder) was down there. [July 2, 1945.] She had dated it the 30th which would be on Saturday. You can't do business on Sunday. The notary never asked for an explanation when I got Exhibit 2 notarized. I mailed it back to Mrs. Snyder." When mailed back the written appearance on Exhibit 2 bore

the signature "Lauretta Blanchard" and the signature and writing, "Jack Goodman, Notary Public. My term expires May 3, 1946", with the impression of his notary seal. Vivian did not deny that she accompanied her mother on July 2 to have it notarized.

Plaintiff testified that she believed and relied on what Mrs. Snyder told her at Kansas City about the divorce and what Alva Blanchard was asking for in it, and that if she had not believed and relied on her statements she would have contested the divorce action; and if she had believed or even thought that he was trying to take all of the real estate or had known that the petition asked for the farm, she would have contested the divorce action.

Plaintiff was cross-examined by Rosa Lee Snyder, in part as follows:

"Q. And didn't I ask you what about your real estate? A. No, you didn't. Q. Didn't you say he could have that? He could have everything? A. No. I did not. I did not. We had already made our agreement. * * * Q. Didn't I tell you that I came down to see if she [Vivian] was all right? A. That is right. Q. You brought the divorce up? A. Oh, no, I didn't. Q. Isn't it true this paper was made up at your request? A. No. It was not. Q. *Isn't it true I told you that he didn't know what he wanted. He hadn't discussed divorce with me?* A. You didn't say that. Q. Isn't it true you said, 'Give him a divorce. Give him Vivian?' A. No. I did not. You said if I didn't give him the custody of Vivian that I couldn't make him help me support her. Q. There was never anything said about support? A. Yes. There was. Q. *Isn't it true at that time this paper was drawn up that I told you that I didn't know what Mr. Blanchard would ask for?* A. You said he was asking for the child. * * * Q. What was said about your real estate in that conversation? A. Nothing. Q. Didn't I ask you about your farm? A. You never said a word about it. Q. And you said, 'He can have that. He can have everything. I am never going back. I am sick of that place?' A. No. I never said that. I said I wasn't going back, that is sure. Q. Did you testify on direct examination that you received a letter

from Alva Blanchard telling that you had got the divorce? A. That is right. Q. Didn't that letter also tell you that the court had given him the farm and everything? A. No. It did not. It never said anything about the farm. * * * Q. Mrs. Brown, isn't it true that when this original notice that is marked Exhibit 2 was drawn up, *that I told you I did not know what Mr. Blanchard wanted?* And you said take that back to him anyway? A. No. You said he wanted a divorce and wanted the custody of the minor child. That is all. And he wouldn't have got either if I knew he could have kept her. Q. *You wish to state to this court that I told you he wanted a divorce. A. Yes.* * * * Q. Didn't you receive a letter from me with the Appearance and Consent to Jurisdiction in it? A. I received that on the paper printed. That is all. Q. Do you recall receiving this notice, Exhibit 2? A. No. You left it down here with me and I mailed it to you."

As a witness for defendant, Mrs. Snyder, on her direct examination persisted, as she had in the cross-examination of plaintiff, that at Kansas City she repeatedly told plaintiff that she had no knowledge of what Blanchard wished to do in the divorce action, in the face of the unquestionable fact that she had drawn the divorce petition the day before. Here is a part of that examination:

"Q. What else was said by her [plaintiff]? A. And I said *'well, I don't know what he wants.'* And she said, 'If you have got any papers with you, get them out and I will sign them.' I said, *'I don't have. any papers for him. He hasn't talked to me about divorce.'* I said, *'The only thing he would say before we left, he said if you refused to come back, he said the only thing for him to do was to get a divorce. No divorce was discussed.* She said, "Do you have papers?"' I said, 'I don't have papers. I have blanks.' She said, 'Get them out and write them up.' I said, *'I don't know what he is asking.* She said, "Make them up and give him a divorce".' Q. She said then to write up the papers. What next was done or said? A. *Well, I told her I could write them up that way but had no way of knowing if that was what Mr. Blanchard would want.* Q. *He*

*had said nothing to you up to that time about wanting a divorce?*
A. No. The only thing he said, 'If she refuses to come back
I suppose the only thing I can do is get a divorce.' *That is all
he ever said about a divorce.* Q. What did you do with ref-
erence to any papers? A. I got original notice out of my
brief *and wrote it up the way she said. She insisted that I take
that.* That it might speed matters up. *And I wrote it the way
she said.* And I told her, I said, '*Now, I have no way of know-
ing whether this is what he wants.* The only thing I can say
to you, if he wants anything else another notice will be sent
you.' She said, 'You can send anything. I will sign anything.'
* * * Q. What papers did you write up? A. I wrote up
an original notice that is here and offered as an exhibit. Q. Did
you write at that time plaintiff's Exhibit No. 2? A. I did.
Q. And if so how much of it? A. I wrote all of it includ-
ing this, 'divorce of you on grounds of cruel and inhuman treat-
ment and asking for custody of the minor child, Vivian Grace
Blanchard.' And when I wrote that I looked at her, I said, '*I
have no way of knowing what he wants. He may want the real
estate.*' And she knows it. Q. And who told her that? A. I
told her that. Q. Who was there when you told her that?
A. Those two girls."

If by "those two girls" Mrs. Snyder meant Charlene Hosey
and Vivian, each of them failed to corroborate her. In fact
Charlene's testimony is rather to the contrary. On direct ex-
amination for the defendant, she was asked, "What was done
with those papers? Do you remember after that? A. She
[Lauretta] was supposed to sign them before a notary. Q. Do
you remember whether they were left with her or brought
back? A. I can't remember. I think she left them."

Vivian, testifying for defendant on direct examination,
after a number of indefinite answers, was asked, "Vivian, what
is the best of your recollection as to what became of those
papers? A. What I started to say was I didn't see the papers
after that, after Rosa Lee had left. I never seen the papers.
If she had them I didn't know."

On motion to strike the answer the court said: "The court

gets the force of her answer to be that she doesn't know what became of the papers. The court understands her answer to be to that effect, that this girl doesn't know what became of the papers."

Mrs. Snyder testified that on Sunday, July 1, after plaintiff had signed the written appearance and consent, a notary could not be found, and she brought Exhibit 2 back to Corydon that night without having plaintiff swear before a notary public that she had signed it. It was Mrs. Snyder's purpose to have Lauretta sign and swear to the instrument before a notary public, which could be done only in Kansas City, yet she testifies she took it back to Corydon without having this done. The plaintiff's testimony that Exhibit 2 was left with her to sign and swear to on Monday, which she did, and then mailed it to Mrs. Snyder the same day seems to be the more probable and credible.

It is very difficult to believe that Mrs. Snyder repeatedly told the plaintiff, as set out above, that she had no knowledge of Blanchard's intentions respecting a divorce, that he had never told her what he desired, that he had never even discussed the matter of divorce with her, in view of the conceded fact that she had prepared and signed Blanchard's petition for divorce which he had verified before her as notary public on June 30, 1945, before she went to Kansas City, in which he prayed not only for a divorce and the custody of Vivian but for all of the property which they had accumulated, and the ninety acres which was a gift to both of them from her grandfather, who had paid before his death the mortgage incumbering it when conveyed to them. If she so stated she was misrepresenting the facts to plaintiff. One does not ordinarily misrepresent unless it be for an ulterior or wrongful purpose. In the light of the prayer in the petition one must be credulous indeed to believe her testimony that "when I wrote that [a divorce and custody of Vivian in Exhibit 2] I looked at her, and I said, 'I have no way of knowing what he wants. *He may want the real estate.*'" She knew then that Blanchard wanted the real estate and had asked for it. What prompted all of the testimony by Mrs. Snyder of her lack of knowledge of Blanchard's intentions may perhaps be found in her asserted statement to plain-

tiff that "the only thing I can say to you, if he wants anything else another notice will be sent you." She was building a basis for her contention that she took Exhibit 2 to Corydon from Kansas City after plaintiff had signed but not sworn to the written appearance, and upon learning from Blanchard that he was asking in the divorce action for all of the real estate, she added to what she had written on the face of Exhibit 2 at Kansas City the words, "and that all property both real and personal be quieted in him" and then mailed the exhibit to plaintiff to inform her of the additional claim, and to direct her to then swear to her signature and return it to Mrs. Snyder. She testified that after her return to Corydon Sunday night, July 1, Blanchard came into the office the next day and she told him what had occurred "and he told me to go ahead and draw up divorce proceedings and ask for the real estate and everything." Just why it was desirable or necessary to "draw up" divorce proceedings additional to those drawn and completed on the preceding Saturday is not apparent. The petition for divorce filed in the clerk's office was verified by Blanchard on June 30, 1945, and bears the clerk's filing stamp dated July 2, 1945.

Mrs. Snyder testified that on July 2, 1945, she prepared a typewritten Appearance and Consent to Jurisdiction, in addition to the one written on the back of Exhibit 2, the body of which is as follows:

"That plaintiff has determined to file a petition for divorce in the district court of Wayne County, Iowa, on the grounds of cruel and inhuman treatment for the September, 1945, Term, of said Court; that without admitting or denying the charges, this defendant hereby enters his [her] appearance thereto when filed, and hereby consents that when so filed that the said Court shall have immediate jurisdiction of the subject matter and of myself, and that the Court may hear the cause at any time it will suit the convenience of the Court."

Mrs. Snyder testified that on July 2, 1945, she mailed this typewritten appearance and a copy of the petition and the original notice, Exhibit 2, as altered by the additional words, to the plaintiff at Kansas City, with instructions to her to go before

a notary public to swear to the written appearance on Exhibit 2 and to the typed appearance, Exhibit 3. The plaintiff admits receiving Exhibit 3 and to signing and swearing to it before Jack Goodman, notary public on July 5, 1945, and returning it to Mrs. Snyder the same day. She denied that either the copy of the petition or that Exhibit 2 was ever mailed to her or that she ever saw the petition or a copy of it until Judge Miles showed her the file in the latter part of October 1946. On direct examination as a witness for her father, Vivian was shown plaintiff's Exhibit 4 and asked if she had ever seen it before, and replied that she had seen it at the room of her and her mother in Kansas City. What she meant was that she had seen a copy of Exhibit 4, as the latter was in the clerk's office. Her mother testified that she never had a copy of the petition, and if Vivian saw one she saw what her mother never saw.

When Mrs. Snyder prepared the petition on June 30, 1945, she no doubt followed the general practice of making carbon copies and putting them in her file of the case. It is also the general practice for an attorney when he or she leaves the office to interview witnesses, opposing parties, or in connection with the case to take the file along. She took her brief case to Kansas City. It is not an unlikely inference that she took this divorce file. She took the original notice blanks. Since, as she repeatedly swears, that the plaintiff told her, not once but several times, that she wished Blanchard to have everything, all of the property, and that she wanted none of it and was sick of the place, and plaintiff told her—a lawyer—to write it the way she said and insisted upon it, and she did write the original notices the way plaintiff said, why did she not put in the original notices Exhibits 1 and 2, that title to all of the property both real and personal was to be quieted in Alva Blanchard, the plaintiff in that suit? She did not do so but claimed she took Exhibit 2 back to Corydon on the pretense of learning Blanchard's wishes, and then altering the notice to conform to them. And if she had the petition or copies of it with her at Kansas City when plaintiff was insisting on giving to Blanchard the entire farm, why didn't she show her petition or give her a copy of it? Or if the petition and copies were in her office, why didn't she

tell her so and also tell her that the petition was drawn just as plaintiff wished it and prayed that title to all of the real and personal property be quieted in her husband, and that she would send her a copy as soon as she returned to Corydon? She did none of these things. Neither did she give any reasonable explanation as a witness why she did not. Nor do the arguments in this court offer a reasonable explanation. In fact they do not mention that the divorce petition was drawn, signed, and verified, before Mrs. Snyder went to Kansas City.

Mrs. Snyder testified that she filed the petition on July 2, 1945, and when Exhibits 2 and 3 were returned from Kansas City she kept them in her file, and that: "Mr. Blanchard came in and told me to wait a while, *maybe I could get her to come back*. Q. How long did you wait? A. Well, he would come in, oh, I think maybe once a week, or ten days, and tell me how things were progressing and what was happening. He said, 'We will wait a while longer.' And it was not until September 11th that he came in and said, 'Well, she is not coming back we might just as well go ahead and get the divorce.'"

There is no evidence that Mrs. Snyder made any effort to get Mrs. Blanchard to return. Since the petition was filed July 2, 1945, the matter of the divorce was of public record. Filing Exhibits 2 and 3 would not add to the publicity. Somebody might see the altered notice. But if Mrs. Snyder and Blanchard were waiting and hoping for Mrs. Blanchard's return, why on August 29, 1945 did Mrs. Snyder write this letter to Mrs. Blanchard at Kansas City: "Am enclosing herewith Quit Claim Deed for you to sign before a Notary Public. *Vivian said* you would turn everything over to her Dad and he was to take care of her and see that she went to school, etc." (Italics added.) The title to the farm was then tentatively on the way to being quieted in Blanchard. A deed was not necessary. Parting with all interest in her grandfather's gift would have little tendency to heal the breach in the family relations, and induce her to come home. It seems rather peculiar that Mrs. Snyder used the words "Vivian said." According to her testimony about eighteen months later in the trial of this case,

it was Mrs. Snyder to whom Mrs. Blanchard repeatedly said that she wished to turn everything over to Mr. Blanchard. If that were true, instead of writing "Vivian said" she would have very likely written "Since *you* told me, etc."

On September 11, 1945, Exhibits 2 and 3 were filed and then Mrs. Snyder had Judge Miles come to Corydon and the divorce was proved and decree was entered giving Alva Blanchard an absolute divorce, custody of Vivian, and quieting title to the property, real and personal, belonging to both of them, in him. Some weeks later plaintiff was informed by her brother that Blanchard was claiming to own the entire farm. She then went to see Attorney E. E. Poston, who represents defendant in this case but had nothing to do with the divorce action. She asked him to investigate the matter, which he did, and he told her "there was nothing I could do unless I would give Vivian a quit claim deed, and that would stop the selling of the place for a while, but it wouldn't do any [permanent] good." He procured a copy of the decree for her.

She then consulted others but did not discover what actually happened until she went to see Judge Miles in the latter part of October 1946, who procured the court files in the divorce action, and she testified that then she saw for the first time the petition and the original notice, Exhibit 2, after it had been altered by Mrs. Snyder. Plaintiff promptly consulted an attorney and not having discovered the alleged fraud within the year after the divorce decree, she filed her petition in equity for relief on November 15, 1946, under the procedure noted in the authorities cited in Shaw v. Addison, 236 Iowa 720, 728 et seq., 18 N. W. 2d 796.

I. The able counsel for appellant in this court in his printed reply argument states: "As has been stated by appellant and commented on by appellee, the decisive question herein is whether Rosa Lee Snyder was guilty of the fraudulent conduct that appellee charges her with."

The proper solution of this case must be determined by the probative weight and value of the testimony of Mrs. Snyder and Mrs. Brown. The credibility of each is an important factor.

Mrs. Snyder was the key witness for the defense and plaintiff's case depended largely on her own testimony. Each was deeply interested in the outcome. Defendant strenuously argues that the evidence is overwhelmingly against the findings and the decision of the trial court. Defendant's witnesses outnumbered those of plaintiff approximately five to one, as the plaintiff stood practically alone. Judge Miles was her witness, but we will refer to his small part in the next division. In addition to Mrs. Snyder and the defendant, Charlene Hosey, an employee of Mrs. Snyder, was a witness for defendant. Her testimony was favorable to plaintiff rather than to the defendant. Her testimony touched no material phase of the case except the important issue of whether Exhibit 2 was left with plaintiff to be signed and sworn to on Sunday July 1, 1945, or was taken to Corydon by Mrs. Snyder. It was her recollection that it was left with plaintiff.

Both plaintiff and defendant married again after the divorce. Just when does not appear. Georgianna Blanchard, the second wife of defendant, testified to one matter. She and Mrs. Blanchard lived in the same rooming house in Centerville. She testified that about the middle of September 1945, plaintiff told her that "she signed Vivian away and also signed the place away." With regard to this testimony, the plaintiff testified: "After I seen Gene Poston and I came home to my room I said 'It looks to me like I have signed my baby over and the place too, from the looks of what the court signed it over to him.'" That was about the only fair conclusion she could reach from Mr. Poston's advice. Mr. Poston was not a witness.

Vivian was a witness for her father. Her testimony concerns but one or two points. She testified that she saw the divorce petition in their room after Mrs. Snyder left Kansas City. Vivian remained with her mother until about July 9, 1945, when she returned to her father. She and her mother gave up their jobs at the hospital and began working in a restaurant. After Vivian went home they corresponded. Vivian's letters are not in the record except the one already quoted. Plaintiff's letters were offered by defendant.

We set out here a few quotations from those letters. Our

only purpose is to shed some light upon the plaintiff and to show that although she was a foolish woman there is nothing in the record before us to convince this court that she was a bad woman albeit by the decree of divorce against her she was in that suit the so-called "guilty party." Default divorces seldom show the real facts either good or bad. There is some indication in this record that perhaps the living conditions of the mother and the adolescent daughter in Kansas City were not decent and perhaps immoral, and that the purpose of defendant in sending Mrs. Snyder to Kansas City was to bring Vivian home. There were other reasons also for making the trip. Plaintiff wrote that she left the country to see the city. She was seeing it by doing drudgery in a hospital and long hours of service in a restaurant. On July 5, 1945, she wrote her husband:

"Dear Alva.

"I got your letter today. Maybe I did do the wrong thing by not talking to you. Even if I lived with you 15 yr. I guess I could never understand you. I was afraid to tell you that I was not satisfied there. I wanted nice things like other people have but I find you have to work harder than I ever did to have them. I quit the Hospital to much work and no pay.

"If Vivian can get a place on the train she will come 'home' Monday. As for me, well I signed the papers and sent them back to your attorney.

"I do wish to be friends anyway. Some of the Neighbors thinks I am crazy for letting you have everything but Alva I never was a thief and I want Vivian to have my share if that is O.K. with you.

"And I know you will hang on to it for her but Me, No I would be broke in a week. I hope if you go on threw your divose you get a woman that is good and also Kind because you desurve it.

"No Alva I won't never stand in your way to you having happiness because I could not have sence enough to Keep a good thing When I had it. Well there is no coming back for me.

"And as for another Man your wrong I don't write to

anyone or even go with anyone. All we have done here is Work like Hell but a little of that rough and heard work is good for me. Ha Ha.

"Well Jack I have bought you a box of King Edwards and will send them with Vivian. I am sure she will help you a lot. But please let her come down and see me some week end. I'll send her the money it want cost you a thing. * * .*

"Well good night I am just a little tired tonite. Tell them all I said Hello and try to forgive me just a little. * * * But if you ever want to come to K. City and see me or Vivian you will be welcome. I think I done wright by not taking only what I did and I am sure some day you'll be happy with some one else.

"Please don't let the first woman break your heart they are not worth it.

-"I hope I remain a Friend. Thanks for writing.
"Laretta Blanchard."

In a letter to Vivian dated July 17, 1945, she wrote: "* * * When are you coming down. Suppose you are bussy now. We sure have a workout in the resturant now. Well V. I miss you but after all your dad needs you he just as well get a divorce because I'll never come there to live as I hate everything about that place. * * * I sure hope you are having a good time with Francis. * * * Well I had better close. Tell them all Hello. Love from Mother."

Another letter: "Dear Vivian: Its eleven o'clock but better drop you a line as tomorrow I work again. How are you. Me fine. * * * I hope you and Francis are having a good time. I would not stand in your way. I think it is part of the reason you went back to your dad. Well Honey if you love him its O.K. with me. I want you to be happy and as for me I am. I miss you yes."

Another letter: "Dearest Vivian: I got your letter today and was glad to hear you were O.K. and also your dad. I am fine and working hearder than ever. I went to work at eight yesterday and worked until 11. And today I worked from 8:30 until ten * * * I don't go with anyone. * * *I only wanted to

see the City and I seen quite a bit of it. When you come down I'll show you around. When you do I'll buy you a pair of Shoes so you can try them on. I'll get you a new housecoat too, before school starts, Honey. Do you still go with Francis? * * * Well Honey I'll close because I am going to bed as one more big day ahead of me tomorrow. The best of luck and don't work to hard.

Love, Mother"

Vivian was placed in a difficult position as a witness. She was in the defendant's home at the time she was a witness. Her relations with her mother had been close and happy.

The defendant's testimony in question and answer covers but two pages of the record. He testified that he and Vivian went to Kansas City in August 1945 and talked to Lauretta on the street, and "she wanted to know what I wanted. She said, 'you should be satisfied, I have signed all the papers and you have everything.'" Vivian's version of the talk was that her mother said "she was tired of the place and would never go back, and the property was his as far as she was concerned."

Defendant also testified that after the divorce was granted he wrote to his wife and "informed her that he had got everything." Why would he write such information if, as he contends, she already knew all about the divorce papers and that as drawn he would get all of the property? In the same letter he testified he said "Go get old Jim Brown if you want him." Plaintiff testified that the letter simply informed her that she was divorced and said nothing about the property. She said she recollected no mention in the Kansas City street meeting of any talk about property.

In determining the probative force and the value of evidence, courts weigh it rather than count the witnesses. In this case that question settles down largely to a determination of the worth and credibility of the testimony of Mrs. Snyder and of the plaintiff, Lauretta Brown. Without any hesitation or doubt we are abidingly convinced that the truth is found in the testimony of the latter. The case is tried anew in this court but the findings of fact and decree of the trial court confirm our convictions. The able judge of that court had the witnesses

before him. He saw them and heard them and had the court-room scene before him. After reviewing the record the court stated that it "has attempted to analyze the evidence in the light of the present relationships of the witnesses, their interests, apparent feelings in the matter, subsequent actions and surrounding circumstances. It is self-evident that the notice as originally made failed to apprise the plaintiff in this case that the husband was asking for his wife's share in the farm given her by her grandfather. * * * The court records indicate a studied desire to refrain from informing the plaintiff in this case of the relief demanded against her."

The record sustains the conclusions of the district court. The petition for divorce in describing the property "accumulated" by the parties, and describing the ninety acres, leaves the intimation that defendant held title to the land; and that plaintiff was not the owner of an undivided forty-five acres of it. In offering proof upon the default in the divorce action, in answer to Judge Miles' question "Is she claiming any part of this property?" the defendant's answer that "she didn't claim anything" was not fully informative. Without any claim he knew she held title to an undivided half of the land.

It may also be noted that in answer to the Judge's question, "Had you ever had any trouble with her before last June?" defendant answered: "Not only a few words now and then."

The failure of Mrs. Snyder at Kansas City to tell the plaintiff of the then-prepared divorce petition and the full relief prayed for, her misrepresentations that Blanchard had never even discussed divorce with her, the preparation of the original notices stating the relief he was asking or would ask was divorce and child custody only, and her verbal assurance to plaintiff of like character, are additional evidence of the planned purpose to deceive, mislead, and lull the plaintiff into a feeling of security, and to secure her written appearance and consent to jurisdiction and a hearing without a contest or personal appearance of plaintiff in court.

In the excerpts of testimony herein we have italicized numerous questions and answers of Mrs. Snyder. If they were so

stated to plaintiff they were false, and if they were not stated, her testimony in this case was false.

For corroboration of her testimony defendant's argument points to some statements in the letters of plaintiff. One is that she hated everything about the farm place. This, of course, didn't mean that she was giving it to defendant. She testified: "I said he had the place for the use of it, why didn't he leave me alone."

In a letter to Vivian, she wrote: "You said in one letter you milked My Cow. Well Honey I don't have a cow because I left everything to your dad." In Vivian's first letter she wrote that "Mom said she left the cow and everything else" to pay back the $50. In another letter to Vivian she wrote: "I don't think your dad should kick he has everything and even the pappers signed. I have a copy of them. There will be no trouble on either part." The only papers she signed were the written appearance on Exhibit 2 and the typewritten appearance, Exhibit 3. She said she had a copy of them. And she did have. She had a carbon copy of Exhibit 3 which Mrs. Snyder mailed. And she had Exhibit 1, the copy of Exhibit 2, as it was originally made on Sunday July 1 by Mrs. Snyder, but without the words: "and that all property both real and personal be quieted in him.", placed there by Mrs. Snyder by her own admission, sometime, somewhere, but not at Kansas City.

In the letter of July 5 which plaintiff mailed to defendant, which is set out herein, she spoke of returning the other "pappers" and of letting him have everything to share with Vivian, as "I never was a thief."

Defendants place much stress on the word "everything." This word could include her forty-five acres, but the word must not be interpreted out of context. Its meaning as used by her must be sought in her knowledge, her circumstances, and other things she said and did. Her first desire was to pay back the $50. She did not wish to be considered a thief. She wrote Alva that she thought she had done "wright" by not taking more.

She knew that she had title to the undivided half of the farm. She said that she was willing that defendant should have

the other half, and about six months before the separation they had discussed the matter and she told him he could have his half but not her half. It was her grandfather's gift, and knowing nothing about the statutes and having never consulted a lawyer she assumed that her land could not be taken from her. That was her thought when she consulted Poston and when she inquired of others how and why the court could take it when it was in her name. When she used the term "everything" she meant the defendant's half, and she was willing that he should have the household goods and the farm equipment, all earned by their joint efforts. When defendant sent her the quitclaim deed to the farm, either the whole or an undivided half, she promptly tore it up. That was a definite expression that she had no thought or intention of conveying her half to him.

When plaintiff said "pappers" she meant Exhibit 2 and Exhibit 3, both of which she had returned. The first she had returned on July 2 and the last on July 5. She never meant that she had returned both on July 5. Mrs. Snyder by her misdating Exhibit 2 is responsible for plaintiff's inability to show by the notary's jurat the correct date of July 2. Mrs. Snyder had filled in the date, June 30, and the notary did not change it. Vivian was with her mother when it was done on July 2 and she did not deny it.

It is our conclusion that the findings and decree of the district court are fully sustained by the record, and by evidence of the quality and sufficiency required by law.

II. The decision in Hopping v. Hopping, 233 Iowa 993, 10 N. W. 2d 87, 152 A. L. R. 436, and the decisions cited therein in support do not aid the defendant, and have no application in this case. In the cited case no claim for alimony was mentioned in the original notice nor in the petition. The original notice was personally served, and an attorney entered his appearance for defendant, but later withdrew it, and a default was entered because of no appearance or pleading, and decree of divorce was rendered and permanent alimony was awarded. Defendant urged that the judgment went beyond the petition and prayer for relief and was invalid as to the alimony. This court upheld the judgment in its award of alimony, inasmuch

as the awarding of alimony was but a mere incident of divorce, and the court under section 10481, Code of 1939 (section 598.14, Code of 1946) of its own volition might, under proper circumstances, award alimony even though no specific request was made therefor, since the said statute was in effect a notice to the defendant, of which he must take cognizance, that alimony might be so awarded.

We have no such case before us. Here the plaintiff falsely represented to the defendant that he would ask no division of the property and would seek no part of the defendant's property, although plaintiff's petition then prepared did ask such relief. The plaintiff also prepared an original notice asking no such relief, and falsely represented that the petition would not ask for any more or other relief, and thereby induced the defendant to execute a written appearance and consent to jurisdiction and a hearing on the petition at the court's convenience, with no contest by defendant. Thereafter without the knowledge or consent of the defendant, plaintiff changed the original notice which he filed in court by adding therein a statement that plaintiff would ask a decree quieting in him the title to all property real and personal, including real estate owned by defendant, and filed a petition praying for all such relief, and the court rendered a decree in comformity therewith.

By these fraudulent representations, concealment and conduct, the plaintiff induced and prevented the defendant from appearing in court and contesting the additional claim wrongfully injected into the case. This was a fraud upon the defendant and a fraud upon the court, invalidating the decree quieting title in the plaintiff to the undivided one half of the ninety acres to which defendant had the ownership and title.

The fraud of the plaintiff was extrinsic and collateral to the proceedings in the divorce action.

The judgment and decree of the district court is affirmed in all of its parts.—Affirmed.

All JUSTICES concur.